UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

JEFFREY B. COHEN,
    Plaintiff,

v.

Case No. ELH-18-2476

HARRY M. GRUBER, et al.,
    Defendants.

### DECLARATION OF JEFFREY B. COHEN

I, Jeffrey B. Cohen, declare:

1. My name is Jeffrey Cohen. I am over the age of 18. I am currently restrained of my liberty at a federal correctional institution located in Hazelton, WV. I am fully competent to make this Declaration and I have personal knowledge of the facts stated in this Declaration. To my knowledge, all of the facts stated in this Declaration are true and correct.

2. I am the Plaintiff in the above-referenced action. I make this Declaration in support of the Complaint in the action.

3. Exhibits B, C, D, and E of the Complaint are true and correct records from the regularly conducted business activities of Indemnity Insurance Corporation, RRG and IDG Companies, LLC. As the owner of the two entities and the former CEO, President, COO, and Chairman of the Board of IIC, I am personally familiar with the business operations, record keeping systems, and preparation of the records of the entities. The data utilized to create the records was produced directly from the companies electronic accounting systems maintained by the senior accounting executives of the companies and regularly tested and reviewed by independent auditors. I personally attest to the accuracy of the records.

4. The claims financial data in lines 1 & 3 of the Liabilities Page in Exhibit E is the exact transactional data from IIC's claims management system ("IMS").

1

IMS is a data capture system that recorded every financial expense for each claim on a transactional level. For each transaction, the system recorded: user info, date entered, date approved, date paid, amount, payee, draft number, and allocation reference. All transactions over $100 required approval of the claims adjuster, the claims manager, and the final approval of the President. Financial data could not be deleted once entered into the system, which prevented any amounts paid to be protected from manipulation. I had no involvement in the entering of claims information other than to approve the expenditures.

5. The Financial Statements referred to in the Complaint were created by IIC's senior accounting executives and were regularly reviewed and tested by independent auditors. I had no involvement in the creation of the Financial Statements other than to sign the final versions prior to submission to state incurance regulators. The Statements are the versions required by Delaware law.

6. IDG Companies was contractually engaged to provide certain services to IIC. Based on the contractual engagement, IDG received income from IIC. The collectibility of the IDG Receivable was tested annually by IIC's auditors by tracing the payments from the IDG General Ledger within its electronic accounting system to the physical issuance of the IDG drafts to the deposits in IIC's accounting system to the reconciliation of IIC's bank statements and confirmed by physically viewing the cleared drafts. I have personal knowledge of the testing procedures. The IDG Receivable was tested by Agents of the Internal Revenue Service as part of my personal tax audit for the years 2007-2009. The IRS Agents confirmed the collectibility of the Receivable.

7. I personally authorized millions in payments from IDG to IIC to remit payment on the Receivable.

8. No IIC claim was ever settled or paid without exhaustive discovery procedures to establish legal liability on the part of the named insured policyholder or any applicable additional named insureds. A weekly claims meeting was held at IIC's main office in which I presided as the top claims officer from 2004 to September 2013. Each week all litigated claims were discussed in detail, the weekly meeting was hours long. During the meetings, the team of employees assigned to the claim (included an attorney, adjuster, and a clerk) provided an updated

status on the claims. The meeting included IIC's senior underwriting staff and its senior loss control staff—all provided knowledge and input on the details and background of the policyholder and all relevant actions related to the claim analysis. The details discussed were memorialized and an action plan for each claim was created and updated weekly. Known as an IEVAL, senior claims staff and myself regularly audited the action plans to ensure compliance with IIC's required claims management procedures. The action plans were tested and reviewed by IIC's independent auditors and its reinsurers. Every IIC claim had a detailed action plan with constant updates, all developments in the claim were promptly recorded in the action plan. The aforementioned claims information was electronically stored in IMS and could not be deleted.

9. The electronic claims information from IMS was directly output to an Excel workbook that was protected from editing and sent to IIC's auditors and actuarial firms by the senior accounting staff. I had no involvement in the preparation nor export and delivery of the claims data to the auditors or actuaries. I provided a narrative of my opinion regarding the claims development for the applicable period and transmitted that to IIC's actuaries. Occassionally, I would discuss my narrative with one of the actuaries.

10. The IMS claims data was tested for integrity and congruency by IIC's actuaries and its auditors. Every quarter tied to the last quarter's data for over ten years.

11. IIC's claims reserving methodology was in conformity with the standards set forth by FAS/ASC 50, which required a reasonable estimate based on the company's prior experience with its claims. The standard requires a reserve at the lower end of the estimated range if the liability is not "reasonably estimable".

12. IIC's actuaries utilized five separate and distinct methods to analyze its claims data to project the outstanding reserves. All methods were wll-known and adhered to generally accepted actuarial techniques.

13. IIC's auditors tested its claims, separately and distinctly from the testing of its actuaries. The auditors took a random sampling on a quarterly basis of 50-100 claims and physically reviewed each file in IMS. This included a review

of the adjuster notes, the daily transactional logs, the financial transactions (including confirming the data in IIC's accounting system), the IEVAL and updated action plans, the CRPL (defense counsel reports). Throughout the history of IIC, thousands of claims were randomly tested, no discrepancies were ever reported by any auditing firm. One single claim was identified by a state examiner that had two payments, out of dozens, paid out of the wrong company. The two payments were immaterial to the overall analysis of IIC's claims.

14. The Susquehanna Bank $5 million cash account was improperly recorded on IIC's Financial Statements. It should have been added as a footnote pursuant to FAS/ASC 305 which would have identified it as restricted funds. This reporting deficiency had no material effect to IIC's balance sheet or its income statement.

15. The docket entries referenced in the Complaint as ECF XXX are filed within the docket of <u>United States v. Jeffrey Brian Cohen</u>, 1:14-CR-00310 (D. Md. 2015) and are publicly available to view and confirm. Many of the docket entries were provided by the U.S. Government, all were admitted by the court.

16. I sent multiple letters to Rod Rosenstein and Stephen Schenning in which I reported the improper conduct of AUSA Harry Gruber.

17. I have admitted to certain federal violations, my actions included:

- Sending wires across states lines to a premium finance company to obtain money by false pretenses. No party lost any money as a result of my actions. The finance company profited over $240,000 from my actions;

- Sending wires across state lines that falsified bank statements. No wire was sent to any financial victim and no party was deprived of any money as a result of my actions. All fictitious bank accounts were removed from IIC's balance sheet prior to the preparation of its June 30, 2013 Financial Statement;

- Creation of a fictitious letter of credit (LOC). No wires were sent to any financial victim and no party was deprived of any money as a result of my actions. The LOC was never included in IIC's balance sheet assets and was not publicly disclosed to any policyholder. The LOC was removed within 8 months of its creation;

- Sending wires across state lines that falsely confirmed certain reinsurance transactions. The information was not sent to any financial victim nor was any party deprived of any money as a result of my actions;

- In January 2013, I sent a letter to the Delaware Department of Insurance stating that the Susquehanna bank account referenced above was not a "compensating amount[s] for any encumberance." The letter was truthful, the account was not encumbered, it was restricted. The information was not sent to any financial victim nor was any party deprived of any money as a result of my actions; and

- I misrepresented the amount of IIC's reinsurance to three insurance brokers who represented IIC policyholders: Whitmore Group (representing the Light Group); Knight International (representing the Lyons Group); and Pure Risk solutions (representing RCI International). Although my actions deceived their recipients, each received valuable insurance coverage in exchange for their premiums. Combined, the three policyholders submitted over 8,000 claims to IIC. IIC paid several million dollars in claims on behalf of the policyholders. While I operated IIC, no claim was ever denied because of a lack of funds or inability to provide coverage.

I declare under the penalty of perjury that the foregoing Declaration is true and correct. I have executed this Declaration on August 2, 2018 at Bruceton Mills, WV.

_____
Jeffrey Cohen